## UNITED STATES DISTRICT COURT

## DISTRICT OF MAINE

| | |
|---|---|
| UNITED STATES OF AMERICA )<br><br>v.  )<br><br>HECTOR FUENTES  )<br><br>AND  )<br><br>GUILLERMO FUENTES,  )<br><br>DEFENDANTS  ) | CRIMINAL NO. 2:12-CR-50-DBH |

## REDACTED DECISION AND ORDER ON JOINT MOTION TO SET ASIDE VERDICT

The defendants Hector and Guillermo Fuentes have moved for a new trial.[1]  They base their motion upon an assertion that, early in the trial and well before deliberations began, one juror expressed to an outsider his prejudgment of their guilt with an ethnic slur, "guilty wetbacks."  For the reasons that follow, I **GRANT** the motion.

### PROCEDURAL BACKGROUND

The charges against the Fuentes brothers were conspiracy to harbor undocumented aliens for profit, harboring undocumented aliens for profit, and aiding and abetting document fraud, arising out of their Mexican restaurant operations in Biddeford, Waterville, and Westbrook, Maine.  Magistrate Judge

---

[1] Although they caption their motion as "Defendants' Joint Motion to Set Aside Verdict" (ECF No. 222), they conclude their motion by asking for a new trial and that is what Fed. R. Crim. P. 33 contemplates.

Rich conducted jury empanelment on Monday, March 4, 2013, and seated a jury of twelve members with three alternates. The trial began before me on Thursday, March 7, 2013, and the evidence concluded on Friday, March 15, 2013. I charged the jury on Monday, March 18, 2013. The jury returned a verdict of guilty on all counts as to both defendants later that day.

On April 16, 2013, I received a memorandum from one of this Court's Probation Officers that a defendant who was under her supervision in an unrelated case had reported to her a comment that a Fuentes juror allegedly made to that supervisee during the trial. I immediately asked the Clerk's Office to provide a redacted copy of the memorandum to the lawyers for all parties.[2]

As a result, a conference of counsel took place on May 2, 2013, with the Probation Officer in attendance. I asked her to recount what the supervisee had told her and allowed the lawyers to follow up with questions. On May 29, I interviewed the supervisee with the lawyers in attendance. On June 27, I supplied the Probation Officer's contemporaneous logs to the lawyers and interviewed the juror with the lawyers in attendance. On each occasion, I invited proposed questions from the lawyers in advance and, during the proceedings, took a recess to allow them to propose additional questions in light of what they had heard thus far. All these interviews were in camera but on the record.[3]

---

[2] It was redacted to eliminate the name of the supervisee, but the name later was provided to the parties' lawyers.

[3] I did not put any of the interviewees under oath. At the time of interviewing the Probation Officer it did not occur to me and no one requested it. For the other two interviews, my concern was to obtain all that those individuals could tell me without frightening them with the

*(continued next page)*

2

Now, the defendants have filed this motion for new trial and the government has objected.

## FACTS

It is undisputed that both the defendants are of Mexican origin, and now legal residents of the United States.[4]  A significant number of the government's witnesses (primarily the defendants' restaurant employees) are also from Mexico but present in the United States illegally.  During jury selection, Judge Rich asked the panel under oath:

- [I]t is anticipated . . . that several of the witnesses at trial will testify that they are aliens, in other words, non-U.S. citizens who entered the country unlawful[ly] and that they worked at the defendants' restaurants.  Do any of you have any strong views one way or the other about immigration that might impact your ability to fairly and impartially consider the evidence in this case?

- Are any of you more or less inclined to believe the testimony of a witness because he is an alien, he or she is an alien, in other words, non-United States citizen who was in the United States unlawfully and not eligible to work in the United States?  Anybody more or less inclined to believe the testimony of a witness simply because they are in the United States illegally?

_____

formalities of an evidentiary hearing and what that might mean in its consequences for them.  I already had the Probation Officer's report of what the supervisee had said to her, and it was a matter of confirming or contradicting that report and seeking further elaboration.  I did allow the supervisee to have his lawyer with him because he was still awaiting sentencing before another judge.  For the juror, I feared that legal proceeding formalities would result in his refusing to answer questions.  In other words, my focus throughout was on obtaining all the available information to assess the impartiality of the jury for the trial just ended, not what might be available for further proceedings against the individuals being interviewed.  I also understood First Circuit caselaw to allow me the discretion whether or not to examine them under oath.  See, e.g., United States v. Boylan, 898 F.2d 230, 258-59 (1st Cir. 1990).  Comments at the time of the juror interview led me to believe that the government considered an evidentiary hearing with testimony under oath necessary, and I therefore asked the parties to brief that issue.  Since neither brief refers to the issue, however, I consider it abandoned.

[4] Their motion states at page 22 that they are U.S. citizens.  Mem. in Supp. of Defs.' Joint Mot. to Set Aside Verdict at 22.  But elsewhere the same document describes them as legal residents.  Id. at 1.  The evidence at trial established that they are legal residents.  See Gov't Exs. 2B and 3D.

- Hector Fuentes and Guillermo Fuentes were born in Mexico, ladies and gentlemen.  They are both lawful permanent residents in this country.  Would that fact affect any of your abilities to be fair and impartial in this case?

- [T]here's been a lot of publicity about lawlessness in Mexico.  Do any of you think that a Mexican-born citizen is more likely to commit a crime in this country than an American-born citizen?

- Are any of you, ladies and gentlemen, members of any organization that either actively supports or actively opposes tighter restrictions at our border with Mexico?  Anybody a member of any organization either for or against tighter restrictions on our border with Mexico?

- Hector Fuentes and Guillermo Fuentes, obviously, as we say in Maine, are from away.  Do any of you believe that they should be judged differently from a Maine citizen?

- [T]he Court will also instruct you that you must base your verdict solely and exclusively on the evidence and on the law as presented in the courtroom and that your verdict must not be influenced either by sympathy or by prejudice or by anything that you may have read, seen or heard outside of the courtroom.  Again, is there any one of you who either would not or could not follow that instruction?

Jury Selection Tr. at 20:10-18, 21:10-17, 22:15-19, 22:20-24, 22:25-23:5, 23:6-9, 27:17-22 (ECF No. 177).

A number of jurors approached sidebar individually and admitted to bias that would prevent them from serving impartially.  As a result, the Magistrate Judge excused them for cause.  But the juror who allegedly made the comment that provokes this motion for new trial did not respond to any of these questions.

On either the first or second day of trial,[5] there was testimony that the restaurant employees sometimes referred to each other as "wetbacks."

Both the supervisee and the juror sometimes went to the Eagles Club in Portland, Maine (the juror was a regular). A mutual friend had previously introduced them, but their acquaintance with each other was very limited.

The juror and the supervisee were both at the Eagles Club on the evening of Saturday, March 9, the day after the second day of the Fuentes trial, around 9:30 p.m. The juror came up to the supervisee and started talking. The supervisee asked him "What's new?" and the juror reported that he was on jury duty. Chambers Conf. Tr. 10:16, May 29, 2013 (ECF No. 191). The supervisee asked if it was "anything interesting." Id. at 10:17. According to the supervisee, the juror responded that "it was an immigration thing, but he went on to say he wasn't supposed to talk about it." Id. at 10:19-20. Nevertheless, the juror did proceed to "talk about it," mentioning the name of a restaurant

---

[5] No official transcript has been requested or filed. The government says that this testimony occurred on the second day of trial. See Gov't's Resp. in Opp'n to Defs.' Joint Mot. to Set Aside Verdict at 7-8 (ECF No. 225). The rough draft realtime version that I have in my notes shows that testimony of this nature occurred on the first day as follows:

> Q. When you and Hector and Guillermo Fuentes and the waiters would joke about how you crossed, was there a name that you had called each other?
> A. Wet backs.
> Q. What is a wet back?
> A. That's someone who crosses from Mexico to the United States illegally.
> Q. And did you use that term with Guillermo Fuentes?
> A. Yes.
> Q. And what about with Hector Fuentes?
> A. Also.
> Q. Did either of them ever call you a wet back?
> A. We would joke sometimes yes and they would call us that.
> Q. You and other workers?
> A. Yes.

Regardless of whether it was the first or second day, it is undisputed that the testimony occurred prior to the date on which the juror made the remark at issue here. That is all that matters.

and stating: "They are all guilty wetbacks anyway."[6]   The entire conversation lasted three or four minutes.

The supervisee reported the juror's comment to his Probation Officer on Monday morning, March 11, 2013, when he had a previously scheduled meeting with her.   The Probation Officer recorded the interchange in her contemporaneous log.[7]   At the time, the supervisee did not remember the juror's name and reported only that he was an older man with white hair.[8]   The Probation Officer asked the supervisee to try to find out the identity of the juror.

About two weeks later, the supervisee saw the juror again and ascertained his first but not his last name.   The supervisee reported the name to a different Probation Officer on April 3, and on April 12 informed the original Officer that he had done so.[9]   After verifying the information with the other

---

[6] I use the language reported by the Probation Officer in her contemporaneous chronological log, which was introduced as a court exhibit on June 27, 2013.   See Court Ex. 2, June 27, 2013.   She had no reason to embellish it, and her record was closer in time to the incident. During my much later interview of the supervisee, he recalled the juror as saying either that "they were a bunch of guilty wetbacks" or that "the defendants were a bunch of guilty wetbacks."   Chambers Conf. Tr. 11:1, 17:4-5, May 29, 2013.   I credit the earlier version that he gave the Probation Officer because it was contemporaneous.

[7] The Probation Officer wrote:

> Of note, D reported that he and his girlfriend were recently out to dinner and he encountered a man he knew from long ago.   D reported that this man stated that he is on the jury for a federal case for immigration.   D stated that this man made the comment that, "they are all guilty wetbacks anyway."   USPO asked for identifying information on this individual and D reported that he could not remember his name.   He stated that he is an older white male.

Court Ex. 2, June 27, 2013.

[8] The log says "an older white male."   Court Ex. 2, June 27, 2013.   But the Probation Officer's memorandum to me refers to the white hair color as well.   See Court Ex. 1, May 2, 2013.   That physical description (white hair and age) matches that of a particular juror and the first name that the supervisee provided after a later encounter also matches.

[9] See Court Ex. 1, May 2, 2013 ("On April 3, 2013 . . . [the supervisee] informed the interviewing officer that he had again encountered the aforementioned individual and had asked the man for his name."); Court Ex. 2, June 27, 2013 (April 12, 2013 entry: "D asked PO

*(continued next page)*

Officer and confirming with the Clerk's Office that there was a juror with that first name in the Fuentes trial, the supervising Officer then prepared her memorandum reporting the incident to me.

The juror denies making the Saturday evening comment to the supervisee. But I have favored first the credibility of the Probation Officer and second the supervisee's version of what occurred, discounting the juror's denial of the statement for several reasons. The Probation Officer had no reason to do anything other than provide an unvarnished report. She also kept contemporaneous logs. The government challenges the credibility of the supervisee, but offers no reason why on Monday morning when he met with his supervising Officer, the supervisee would invent a Saturday evening interchange with an unnamed juror during an ongoing trial, a juror who later admitted to being acquainted with him and seeing him from time to time at the Eagles Club. The supervisee had pleaded guilty on February 28, 2013 before another judge to a federal offense. If anything, as the supervisee told me in the interview, the supervisee was concerned that his revelation to the Probation Officer might prejudice him.[10]   He was also very direct and forthcoming in answering my questions, and included details that he was likely to have

_____

if I had spoken with PO Giblin as D had found out the first name of a juror on a federal case, who reportedly made racial comments regarding the defendants.").

[10] "I don't think it would [be] a positive thing because, frankly, what I've told you is probably not a good thing for the Government, but I don't think I have any real choice in the matter." Chambers Conf. Tr. 22:9-12, May 29, 2013. The government intimates that he might have been seeking gain in his own case because the investigating agent was also testifying in the Fuentes trial. See Gov't's Resp. in Opp'n to Defs.' Joint Mot. to Set Aside Verdict at 18-19. There is no evidence that the supervisee knew of that overlap at the time he reported to the Probation Officer, and the cases were unrelated. In fact, he denied knowing that his investigating agent was a witness at the Fuentes trial, and the government has not contradicted that assertion. Chambers Conf. Tr. 21:20-22:4, May 29, 2013.

learned only from the juror, for example, that the juror "wasn't supposed to talk about it." Aside from reporting the "all guilty wetbacks" remark, the supervisee was otherwise complimentary of the juror ("seems like a nice old guy," Chambers Conf. Tr. 8:17, May 29, 2013; "just a real easygoing guy," id. at 15:18). Finally, the juror's version of events shifted considerably during my interview of him. At first he did not admit that he knew the supervisee, even after being shown a photograph.[11] Then he admitted that he was acquainted with him after all, and that they did see each other at the Eagles Club from time to time, and even that he had distinct views of the supervisee's girlfriend, calling her "floozy," Chambers Conf. Tr. 21:21, June 27, 2013 (ECF No. 217). Likewise, at first the juror denied using the term "wetback" ("Q. Is that a term you use? A. I don't believe so."), id. at 24:5-6, but ultimately admitted to using it in connection with the trial. But then he said that he did not make the "wetback" comment until after the trial ended and only in speaking to the bartender at the Eagles Club who, he said, was Puerto Rican and was offended by it. Id. at 31:7-32:4. The supervisee had reported the juror's use of the term long before then, and thus could not be building a story based upon this later incident. Given the juror's ultimate admission to being acquainted with the

---

[11] In their legal memorandum, the defendants say that I showed him the photograph twice, citing the transcript that says "I'm going to show you what we're marking as a court exhibit, which I've shown you before." Mem. in Supp. of Defs.' Joint Mot. to Set Aside Verdict at 15; Chambers Conf. Tr. 19:21-23, June 27, 2013 (ECF No. 217). My recollection is that I showed the juror the photograph only once (the transcript shows one occasion) and that the transcript entry "I have already shown it to you" reflects my inartful aside to the lawyers as I handed the photograph to the juror. (I had shown the lawyers the photograph during the portion of the conference before the juror came into the room, explaining that it came from the presentence report.) That is also the government's understanding. See Gov't's Resp. in Opp'n to Defs.' Joint Mot. to Set Aside Verdict at 16 n.4.

supervisee and using the term "wetback" in connection with the trial, albeit later, I have no reason to doubt the supervisee's contemporaneous report to the Probation Officer of what occurred on March 9.[12]

**ANALYSIS**

The Sixth Amendment to the United States Constitution guarantees defendants in a federal criminal trial the right to an "impartial jury."[13]  "An impartial jury is one 'capable and willing to decide the case solely on the evidence before it.'"  Sampson v. United States, 2013 WL 3828663, at *11 (1st Cir. July 25, 2013) (quoting McDonough Power Equip. v. Greenwood, 464 U.S. 548, 554 (1984)).  Recent First Circuit cases have examined that issue in two contexts.  Sampson granted a new trial because of dishonest answers that a juror gave at jury empanelment to questions that bore upon impartiality for capital sentencing.  United States v. Villar, 586 F.3d 76 (1st Cir. 2009), established that the Constitution overrides Fed. R. Evid. 606(b)(1)'s restriction

---

[12] Those are the most important reasons, but there are others.  For example, when I asked the juror "if [the supervisee] should say that he did talk to you during the trial, what would be your reaction to that?," the juror's response was defensive: "It would be his word against mine, I guess.  I don't believe I ever talked to him."  Chambers Conf. Tr. 23:16-20, June 27, 2013.  After his initial disavowal of the term "wetback," the juror also reacted defensively when asked what he understood the term to mean.  (He responded, "I don't have nothing against Mexican people," and described having Mexican girlfriends when he was 23 and stationed at Fort Bliss, Texas, in the Army.  Id. at 24:7-13.)  The juror also had a flimsy explanation for his use of the term, attributing it to his father-in-law who allegedly used it to describe himself as a Canadian who had come to the United States.  Id. at 24:17-22.  Moreover, the supervisee's identification of the juror corroborates the supervisee's credibility.  He gave an appropriate physical description of the juror in his Monday morning report to the Probation Officer after two days of trial; later he produced the correct first name of that juror.  I do recognize, however, that the supervisee's recollection of events was perhaps imperfect in one respect.  He believed that the exchange occurred when there were only one or two days of trial left.  Whether that was the juror's error or the supervisee's error I do not know, but the trial went on for another week, and the Probation Officer's log supports the dates I have used.

[13] "In all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial, by an impartial jury of the State and district wherein the crime shall have been committed . . . ."  U.S. Const. amend. VI.

on using juror statements to impeach a verdict, and allows a judge to question a juror about things said during deliberations when serious allegations of racial or ethnic bias are raised. The defendants here assert that this juror lied at jury empanelment about his ability to be impartial and then prejudged the case very early in the trial, based upon ethnic prejudice.

### *Dishonesty at Jury Empanelment*

Applying the Supreme Court decision in <u>McDonough</u>, <u>Sampson</u> enunciated the following requirements for when dishonest answers at jury empanelment can justify setting aside a verdict: "first, that the juror failed to answer honestly a material voir dire question"; second, that an honest answer "'would have provided a valid basis for a challenge for cause.'" 2013 WL 3828663, at *12 (quoting <u>McDonough</u>, 464 U.S. at 556). In a footnote, <u>Sampson</u> also acknowledged the possibility of honest but mistaken answers, and said that "in the absence of dishonesty, post-trial relief, if available at all, will require a more flagrant showing of juror bias." <u>Id.</u> at *12 n.8 (citation omitted).

<u>Sampson</u> involved a juror's dishonest answers concerning events in her life, matters that were objectively ascertainable, where the juror herself admitted that her answers had been deliberately dishonest. Here, by contrast, any dishonesty by this juror at jury empanelment did not involve misrepresentation of objective facts, but rather his failure to admit or recognize subjective bias. That he demonstrated bias during the trial (later in this opinion I conclude that he did) does not alone show that he was dishonest at

jury empanelment.[14]  Many people are unaware of their biases or unwilling to admit them even to themselves.  The First Circuit recognized that human frailty in <u>Sampson</u>:

> [A] person who harbors a bias may not appreciate it and, in any event, may be reluctant to admit her lack of objectivity. As the Supreme Court explained over a century ago, "[b]ias or prejudice is such an elusive condition of the mind that it is most difficult, if not impossible, to always recognize its existence."

2013 WL 3828663, at *11 (quoting <u>Crawford v. United States</u>, 212 U.S. 183, 196 (1909)).  Here, this juror continues to assert that he is not biased.

I conclude that the defendants are unable to meet the first <u>Sampson</u> requirement—they have failed to show that the juror was dishonest in his answers to the jury empanelment questions.[15]  Whether the defendants meet <u>Sampson</u>'s more demanding standard when mistake rather than dishonesty is satisfied ("a more flagrant showing of juror bias," 2013 WL 3828663, at *12 n.8) is encompassed in my analysis of the juror's later statement, which follows.

### *Prejudging Guilt or Innocence Based Upon Ethnic Prejudice*

This juror's comment to an outsider at a social club Saturday evening following the second day of trial raises two important concerns:  that at that

---

[14] I recognize that the Ninth Circuit says that when "'a juror has been asked direct questions about racial bias during voir dire, and has sworn that racial bias would play no part in his deliberations, evidence of that juror's alleged racial bias is indisputably admissible for the purpose of determining whether the juror's responses were truthful,'" <u>United States v. Hayat</u>, 710 F.3d 875, 886 (9th Cir. 2013) (citations omitted), and I certainly take it into account, but I find it alone insufficient to establish untruthfulness at empanelment.

[15] Some of the commentators read the cases as requiring "deliberate deception" on the topic of bias at jury empanelment.  27 Charles Alan Wright et al., <u>Federal Practice and Procedure</u> § 6074 n.134 and accompanying text (2d ed. 2013).

early stage of the trial this juror had already made up his mind that the defendants were guilty, and that ethnic stereotyping affected his judgment.

First I assess the words that he used in order to determine whether they in fact signify prejudgment and ethnic bias against these defendants. The supervisee reported to the Probation Officer that the juror said that "they are all guilty wetbacks anyway."[16]  Could the statement be interpreted narrowly to mean that the juror was referring only to the illegal immigrant witnesses?  Had the juror admitted the statement and provided me that narrowing interpretation along with his denial of prejudice, it might have been plausible, given the testimony that some of the workers used the term "wetbacks," and their admissions to being in the United States illegally.  But in the absence of any such narrowing interpretation by the person uttering it, it is most reasonable to construe the statement as referring to the defendants and the illegal alien restaurant workers collectively ("all").  Indeed, when the juror finally admitted using the term "wetback" in connection with the trial—but allegedly to a bartender later—he still provided no narrowing explanation that he was referring only to the government's witnesses.  So I find that this juror voiced a prejudgment of guilt in conjunction with an ethnic slur against these defendants and others ("they are all guilty wetbacks").  In doing so, he

---

[16] During my interview of the supervisee he said that the juror said either that "the defendants were a bunch of guilty wetbacks" or that "they were a bunch of guilty wetbacks."  The first alternative is an unvarnished judgment of the defendants' guilt at a very early stage of the trial linked directly to a disparaging ethnic stereotype.  The second alternative is substantially the same as the statement I analyze in text, omitting only the adjective "all."  Thus, even if I used the language the supervisee recounted in his interview with me, I would reach the same conclusion as I do in text based upon what he said to the Probation Officer.

demonstrated that he was not "'capable and willing to decide the case solely on the evidence before [him].'"  Sampson, 2013 WL 3828663, at *11 (quoting McDonough, 464 U.S. at 554).

Not every juror misstatement during a trial necessarily invalidates a verdict.  Given human frailty, a juror might make an inappropriate ethnic statement after a drink on a Saturday night at a club, yet later regret it and conscientiously set aside any prejudice in deliberations and assess the evidence with his colleagues, without bias.  This juror's statements do not allow me to reach such a conclusion.  I find beyond doubt that he made the "all guilty wetbacks" statement after two days of trial.  Had he admitted the statement and explained it to me as referring only to the illegal alien witnesses, or had he recognized it as an alcohol-induced inappropriate utterance and persuaded me that he did not really believe its substance and that he had laid it aside in deliberations, perhaps I could then conclude that the defendants had twelve impartial jurors.  (The eleven other jurors did not express any bias or prejudgment.)  I did give serious thought to whether I should interview the entire jury, as District Judge Barbadoro did after the First Circuit's remand in Villar.  But since this juror denies his statement outright, I have no basis upon which to reach a conclusion that he meant it narrowly or that he could and did overcome it in deliberations.[17]

---

[17] I have therefore not explored what the Assistant United States Attorney reported to me at the first conference on May 2, namely, that an unrelated federal agency official had reported to her that about 1-1/2 weeks after the trial, his auto mechanic had volunteered the unsolicited information that he had been a juror in the Fuentes trial and that "when they went back to deliberate, there had been one older gentleman who wanted to vote right away and seemed *(continued next page)*

Even so, on this motion for a new trial that challenges the validity of the verdict, I must determine whether I can consider the juror's Saturday night statements at all.  Fed. R. Evid. 606(b)(1) provides:

> During an inquiry into the validity of a verdict . . . a juror may not testify about any statement made or incident that occurred during the jury's deliberations; the effect of anything on that juror's or another juror's vote; or any juror's mental processes concerning the verdict . . . .  The court may not receive a juror's affidavit or evidence of a juror's statement on these matters.

This case does not involve something that, in the Rule's words or like <u>Villar</u>, "occurred during the jury's deliberations."  The Rule's scope is broader, however, and covers other things that bear upon the "validity of a verdict."  <u>See</u> 27 Charles Alan Wright et al., <u>Federal Practice and Procedure</u> § 6074 n.20.1 and accompanying text (2d ed. 2013) ("[S]o long as a verdict . . . .has been reached, Rule 606(b) applies even where the evidence offered relates to events that preceded the verdict . . . .").  Arguably, the juror's statement here is offered to show "the effect of anything on that juror's vote" or his "mental processes concerning the verdict."[18]  If that is so, I cannot entertain the supervisee's statement about what the juror said, because "[t]he court may not receive . . . evidence of a juror's statement on these matters."  Fed. R. Evid. 606(b)(1).

---

inclined to convict, but that the rest of them said that they would like to spend some time deliberating before calling a vote."  (The juror in question here was 70 years old; the next oldest male juror was age 53.)

[18] At least one case, however, suggests that Rule 606(b)(1) does not preclude consideration of racist statements.  <u>See</u> <u>United States v. Henley</u>, 238 F.3d 1111, 1120 (9th Cir. 2001).

But in <u>Villar</u>, the First Circuit ruled that the Sixth Amendment and the Due Process Clause trump the Rule's prohibition on an inquiry into racial or ethnic bias.  (Unlike this case, <u>Villar</u> involved statements made during actual deliberations.   Since <u>Villar</u> made the inquiry permissible with respect to deliberations, *a fortiori* it is permissible here where the juror spoke to an outsider well before deliberations ever commenced.)  As <u>Villar</u> said:

> While the issue is difficult and close, we believe that the rule against juror impeachment cannot be applied so inflexibly as to bar juror testimony in those rare and grave cases where claims of racial or ethnic bias during jury deliberations implicate a defendant's right to due process and an impartial jury. . . .
> Accordingly, we conclude that the district court here did have the discretion to inquire into the validity of the verdict by hearing juror testimony to determine whether ethnically based statements were made during jury deliberations and, if so, whether there is a substantial probability that any such comments made a difference in the outcome of the trial.

586 F.3d at 87.   Here, I have exercised that discretion[19] because of the seriousness of the charge—prejudgment of guilt associated with ethnic stereotypes—and the reliability of the account.

As a result, I find that these defendants did not have a jury of twelve people all prepared to deliberate impartially on their guilt or innocence. Although the juror assured me that he was not prejudiced against Mexicans,

---

[19] In <u>United States v. Casas</u>, 425 F.3d 23, 48 (1st Cir. 2005), the court said: "'When a non-frivolous suggestion is made that a jury may be biased or tainted by some incident, the district court must undertake an adequate inquiry to determine whether the alleged incident occurred and if so, whether it was prejudicial'" (quoting <u>United States v. Gastón-Brito</u>, 64 F.3d 11, 12 (1st Cir. 1995)).   <u>Casas</u> also said that the trial court's discretion "'is at its broadest when determining how to deal with an allegation of premature jury deliberations.'"  <u>Id.</u> at 49 (quoting <u>United States v. Mikutowicz</u>, 365 F.3d 65, 74 (1st Cir. 2004)).   Although the incident here did not involve deliberations *among* jurors, it did involve one juror reaching a decision before hearing all the evidence.

his comments demonstrate that with ethnic stereotyping he decided these defendants' guilt early in the trial without waiting for all the evidence.

### *Remedy*[20]

The right to an "impartial jury" comes directly from the language of the Sixth Amendment.  The Supreme Court has said that denying another Sixth Amendment right, the right to one's choice of counsel, is structural error. United States v. Gonzalez-Lopez, 548 U.S. 140, 150 (2006).   In cases of structural error, the Supreme Court rejects the argument that Sixth Amendment "rights can be disregarded so long as the trial is, on the whole, fair." Id. at 145.  Structural error requires that a verdict be vacated and a new trial granted, without analysis of whether the error can be treated as harmless.

The Fuentes brothers' right to twelve impartial jurors under the Sixth Amendment is a structural right.  A routine example of structural error is "the specter of a biased judge presiding over a case."  United States v. Padilla, 415 F.3d 211, 219 (1st Cir. 2005) (en banc) (citing Tumey v. Ohio, 273 U.S. 510, 535 (1927) ("No matter what the evidence was against [the defendant], he had the right to have an impartial judge.")).   In contrast, harmless error analysis rather than structural error analysis is appropriate "[i]f the defendant had counsel and *was tried by an impartial adjudicator*." Neder v. United States, 527 U.S. 1, 8 (1999) (emphasis added) (citation omitted).  It is the latter element—

---

[20] Unfortunately, although the defendants argue that a new trial is required, neither side addresses the question of whether juror bias is a structural error automatically warranting a new trial or whether it is instead subject to harmless error review.

16

an impartial adjudicator—that is missing here.  In a capital case, the Supreme Court has said:

> It is well settled that the Sixth and Fourteenth Amendments guarantee a defendant on trial for his life the right to an impartial jury.  Had [a juror who was unwilling to follow the law during the trial's penalty phase] sat on the jury that ultimately sentenced petitioner to death, and had petitioner properly preserved his right to challenge the trial court's failure to remove [that juror] for cause, the sentence would have to be overturned.

Ross v. Oklahoma, 487 U.S. 81, 85 (1988) (citations omitted).  The Sixth Amendment right to an impartial jury is not limited to capital cases, however, and I see no reason why the Ross principle should not apply to the determination of guilt in this trial as well.  As the Supreme Court said in an earlier noncapital case, the defendant "was entitled to be tried by 12, not 9 or even 10, impartial and unprejudiced jurors." Parker v. Gladden, 385 U.S. 363, 366 (1966) (citation omitted) (vacating the outcome where bailiff's remarks tainted two or three jurors).  "When constitutional error calls into question the objectivity of those charged with bringing a defendant to judgment, a reviewing court can neither indulge a presumption of regularity nor evaluate the resulting harm."  Vasquez v. Hillery, 474 U.S. 254, 263 (1986) (racial discrimination in selection of grand jury).  Thus, a new trial is necessary.

Cases from other circuits support this treatment.  See, e.g., United States v. Hayat, 710 F.3d 875, 889 n.9 (9th Cir. 2013) (distinguishing juror bias from harmless error); United States v. Carpa, 271 F.3d 962, 967 (11th Cir. 2001) ("If a court determines there was actual bias, the juror's inclusion in the petit jury is never harmless error." (citation omitted)); Dyer v. Calderon, 151

17

F.3d 970, 973 n.2 (9th Cir. 1998) (en banc) ("The presence of a biased juror cannot be harmless; the error requires a new trial without a showing of actual prejudice.   Like a judge who is biased, the presence of a biased juror introduces a structural defect not subject to harmless error analysis." (citations omitted)).

First Circuit precedent is less definitive, but United States v. Jadlowe, 628 F.3d 1 (1st Cir. 2010), leads me to conclude that the First Circuit would treat what happened here as structural error.[21]   As examples of structural error, Jadlowe referred to "a biased presiding judge" and mentioned favorably a Fourth Circuit decision that an eleven-person jury created structural error.   Id. at 19 (citing United States v. Curbelo, 343 F.3d 273, 281 (4th Cir. 2003)).   In Jadlowe, 628 F.3d at 19, the First Circuit quoted the Supreme Court decision in Neder, which established that structural errors are those that affect the very "framework within which the trial proceeds, rather than simply . . . the trial process itself," 527 U.S. at 8 (citation omitted).   Jadlowe also quoted Gonzalez-Lopez and United States v. Marcus, 130 S. Ct. 2159, 2165 (2010), for the

---

[21] Jadlowe involved a preliminary jury instruction that improperly told the jurors that they could talk about the case throughout the trial and before retiring to deliberate.   The First Circuit said that the instructional error had "'framework' implications" because it could result in early discussion of evidence or witnesses that would prejudice later deliberations "in ways that would be difficult to identify or quantify."   628 F.3d at 20.   Despite these concerns, Jadlowe concluded ultimately that the improper jury instruction was not structural error, because the premature discussion may never have occurred, or may have related to only "tangential matters."   Id. at 20, 21.   It was not the case that "'all or almost all such errors always "affec[t] the framework within which the trial proceeds," or "necessarily render a criminal trial fundamentally unfair,"'" the characteristic of structural errors.   Id. at 20 (quoting United States v. Marcus, 130 S. Ct. 2159, 2166 (2010)).   Instead, Jadlowe went on to perform harmless error analysis.   The record did not reveal whether jurors in fact did discuss the case early.   The court was troubled that they could have discussed significant pieces of evidence (as permitted by the instruction), but said that the Jadlowe trial was not "a close case" and that on account of video surveillance and audiotapes there was no room for doubt about the defendant's complicity in the conspiracy.   Id. at 22.

proposition that in structural error cases "it is often 'difficul[t]' to 'asses[s] the effect of the error.'"   628 F.3d at 19.   The reason, <u>Jadlowe</u> said, is that "the nature of a structural error is to 'produce[] "consequences that are necessarily unquantifiable and indeterminate."'"   <u>Id</u>. (quoting <u>Neder</u>, 527 U.S. at 11).[22]

All of those factors apply here.   I have a juror who determined guilt early in the trial based upon ethnic stereotyping.   That circumstance—that juror sitting in judgment on these defendants—affected the framework of the trial and deprived the defendants of impartial adjudication by twelve unbiased jurors.   I cannot assess the effect of the error unless I examine the entire process of jury deliberations; even then, this juror's denial of what happened would make it impossible to assess its effect, at least on him.   Moreover, as the Fourth Circuit said in <u>Curbelo</u> (finding structural error in the use of an 11-person jury to deliberate), "We simply cannot know what [e]ffect a twelfth juror might have had on jury deliberations.   Attempting to determine this would involve pure speculation."   343 F.3d at 281.   Likewise in this case, I simply cannot know what effect a twelfth juror with an unbiased open mind would have had on jury deliberations.   In <u>Curbelo</u>'s words, attempting to determine this would involve pure speculation.   I conclude therefore that this individual's

---

[22] I am not confronting a case of extraneous influence like jury tampering that, while not structural error, carries a presumption of prejudice.   <u>See</u> <u>Remmer v. United States</u>, 347 U.S. 227, 229 (1954).   <u>But see</u> <u>United States v. Bradshaw</u>, 281 F.3d 278, 287-88 (1st Cir. 2002) (noting subsequent narrowing of <u>Remmer</u> but declining to decide "whether, or to what extent, it remains good law").

involvement as a deliberating juror amounted to structural error and requires that I grant the defendants a new trial.[23]

United States v. Heller, 785 F.2d 1524 (11th Cir. 1986), is somewhat similar to this case. There, evidence of anti-Semitic slurs came to light during jury deliberations, but the evidence included juror statements made early in the trial long before deliberations began. The Eleventh Circuit ruled that the defendant was entitled to a new trial based upon those anti-Semitic utterances that occurred before deliberations began (the court did not permit the jurors to reveal what occurred during deliberations, id. at 1526).[24] The Eleventh Circuit said that an alternate ground for a new trial was that "at least one of the jurors had expressed belief in the defendant's guilt long before formal deliberations began." Id. at 1528. Both of those same considerations support a new trial here. Accord State v. Loftin, 922 A.2d 1210, 1214 (N.J. 2007) ("There is no room in a capital trial for a juror who expresses [during the early stage of the trial] a preconceived opinion of a defendant's guilt. Even more alarming is

---

[23] In United States v. Tejeda, 481 F.3d 44 (1st Cir. 2007), two jurors observed a courtroom spectator make a "throat-slitting gesture" during a witness's testimony. Later, a law enforcement witness identified that spectator as having been seen in connection with the events of the crime. The presiding judge conducted a thorough inquiry of the sitting jury about the effect of the gesture, concluded that the jurors could render an impartial verdict, and denied the defense motion for a mistrial. On appeal, the First Circuit refused to treat the incident as structural error (also observing that no such argument had been made at trial). Id. at 50. But the "bias" in Tejeda arose, if at all, from the courtroom incident, an occurrence at the trial, and the court was satisfied from the voir dire that it did not affect any of the jurors' impartiality. The Fuentes case is different in both respects. See also United States v. Mackey, 114 F.3d 470, 473-74 (4th Cir. 1997) (distinguishing structural errors, which "affect '[t]he entire conduct of the trial from beginning to end,'" from errors that "can occur in a discrete moment of an otherwise fair trial" (citation omitted)).

[24] There was a far greater volume of prejudicial statements in Heller, but I do not read the case as so limited. As other cases have recognized, a defendant is entitled to twelve impartial jurors. See, e.g., United States v. Henley, 238 F.3d 1111, 1120 (9th Cir. 2001) ("[W]e have made clear that the Sixth Amendment is violated by 'the bias or prejudice of even a single juror.' One racist juror would be enough." (quoting Dyer, 151 F.3d at 973)).

20

when the juror's remarks prejudging guilt also suggest racial bias."); <u>State v. Johnson</u>, 630 N.W.2d 79, 83 (S.D. 2001) ("echo[ing] the conclusion" of an Ohio court that a mistrial is appropriate where a "'statement clearly evidences a juror who was not impartial, and instead predisposed to a guilty verdict'" (citation omitted)).[25]

It is true that in 2009 in reversing the trial judge's conclusion in <u>Villar</u> that he could not investigate claims that jurors expressed ethnic bias during deliberations, the First Circuit sent the case back for whatever investigation the trial judge deemed necessary, including a determination of "whether there is a substantial probability that [ethnically biased comments] made a difference in the outcome of the trial." <u>Villar</u>, 586 F.3d at 87. That remand language in <u>Villar</u> arguably suggests harmless error review. On remand, District Judge Barbadoro struggled with whether to assess juror racial bias under structural error or harmless error analysis and had the parties brief the issue. Ultimately he concluded that there was no improper bias at all in the jury decision-making process and thus did not reach the question of structural error. <u>See</u> Tr. of Evidentiary Hr'g at 148:19-149:3, Addendum to Appellant's Br., <u>United States v. Villar</u> (<u>Villar II</u>), 411 F. App'x 342 (1st Cir. Mar. 17, 2011) (No. 10-1789). The First Circuit summarily affirmed. <u>Villar II</u>, 411 F. App'x 342.

I find the 2010 <u>Jadlowe</u> analysis more instructive than the quoted remand phrase in <u>Villar</u> in 2009. I treat the <u>Villar</u> remand language as merely

---

[25] <u>Johnson</u> involved the trial of an African American defendant charged with raping a white woman and a juror statement during a jury empanelment recess that "I've got a rope."

inartful phrasing of the options open to the district judge, which included a determination that the jurors were not ethnically or racially biased at all, the conclusion he ultimately reached. Indeed, the remand language does not even correctly state the harmless error standard, namely that the burden is on the government to show that the error is harmless beyond a reasonable doubt. Chapman v. California, 386 U.S. 18, 24 (1967). In contrast with this single phrase in Villar, the extensive analysis in Jadlowe, along with the Supreme Court cases and cases from other circuits that I have discussed, leads me to conclude that structural error is involved in cases of juror ethnic bias for the reasons I have already articulated.[26]

### CONCLUSION

The parties with their lawyers tried this long and expensive trial well and fairly, and I do not lightly void the outcome. Certainly I share the government's frustration that we did not learn of the incident immediately and before the alternates had been discharged, because the trial could have been salvaged with the juror's replacement by an alternate juror (there is no evidence that he had infected other jurors with his statements). As a result of this juror's conduct coming late to the court's attention, however, all the parties and the court will incur the substantial duplication of time and expense involved in a new trial. But I am absolutely convinced that the juror incident took place in light of the contemporaneous report to the Probation Officer, the supervisee's

---

[26] In 2013, the First Circuit declined to address the question whether juror bias is structural error. See Sampson, 2013 WL 3828663, at *17 n.10 ("In view of the existence of actual prejudice, we need not reach the defendant's contention that the doctrine of structural error applies and obviates any need for a showing of actual prejudice." (citation omitted)).

identification of the juror, and the juror's later admission to knowing the supervisee and having used such language in the same location at a date following the trial.  The defendants are entitled to have twelve—not eleven, but twelve—jurors make that decision impartially based upon *all* the evidence and based upon deliberations among them.  I conclude that these defendants were denied that right, no matter how much this juror believes that he has no discriminatory feelings toward Mexicans.

Accordingly, the defendants' motion for new trial is **GRANTED**.

**SO ORDERED.**

**DATED THIS 19TH DAY OF AUGUST, 2013**

/s/D. Brock Hornby
**D. BROCK HORNBY**
**UNITED STATES DISTRICT JUDGE**

23